UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BETTY ANN JOHNSON,

      Plaintiff,                        Civil Action No. 13-11715

v.                                     HON.  NANCY G. EDMUNDS
                                        U.S. District Judge
                                        HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Betty Ann Johnson brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

      On January 16, 2007, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability as of December 13, 2005 (Tr. 242).  After the initial denial of the

claim, Plaintiff requested an administrative hearing, held on May 20, 2009 (Tr. 69). On June 10, 2009, Administrative Law Judge ("ALJ") David B. Washington found Plaintiff not disabled (Tr. 100-107). On October 5, 2010, the Appeals Council remanded the case for further development, directing the ALJ to (1) articulate the weight allotted to the treating source opinions and, (2) elicit additional vocational testimony pertaining to Plaintiff's psychological limitations (Tr. 109-110).

ALJ Thomas L. Walters presided at a second hearing held on October 26, 2011 (Tr. 44). Plaintiff, represented by S. Lewis Weir, testified, (Tr. 48-61), as did James R. Engelkes, a vocational expert ("VE") (Tr. 61-67). On November 9, 2011, ALJ Walters determined that Plaintiff was not disabled, finding that although she was unable to return to her previous work, she was capable of a significant number of exertionally light jobs (Tr. 32-37). On February 21, 2013, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the final decision on April 16, 2013.

**BACKGROUND FACTS**

Plaintiff, born May 2, 1960, was 51 when ALJ Walters issued his decision (Tr. 37, 242 ). She received a GED (Tr. 320) and worked previously as an assembler (Tr. 316). Her application for benefits alleges disability as a result of neck, back, and left elbow conditions, "possible breast cancer," bipolar disorder, depression, anxiety, emphysema, and arthritis (Tr. 315).

### A.    Plaintiff's Testimony[1]

Plaintiff offered the following testimony:

She currently lived in Pinckney, Michigan (Tr. 48).  She lived in subsidized housing and received food stamps (Tr. 49).  Her former position as a factory worker entailed die casting, trim operations, and machine operation (Tr. 49).  She contrasted her former ability to perform a variety of skilled job tasks with her current state in which she was unable to hold a thought "going . . from one room to the next" (Tr. 49).  Just before the onset of disability, she become unable to keep up with the lifting and bending requirements of her job as an inspector due to arm, leg, back, and neck pain (Tr. 50).  She experienced Chronic Obstructive Pulmonary Disease ("COPD") but smoked eight cigarettes a day (Tr. 50).  She had tried to quit smoking two times in the past and was now taking medication to achieve smoking cessation (Tr. 51).

Her back and radiating leg pain was exacerbated by sitting for long periods (Tr. 51).  Pain block injections to the neck, head, and back helped "a little bit" (Tr. 52).  She experienced pain turning her head (Tr. 53).  She also experienced left arm pain despite undergoing wrist surgery (Tr. 53-54).

Plaintiff received psychotropic medication from her family doctor and was currently attending counseling sessions (Tr. 54).  As a result of depression, she had "no activity in [her] life whatsoever" (Tr. 55).  While out in public, she experienced panic attacks, characterized

---

[1]Refers to the October 26, 2011 hearing.

by shaking and shortness of breath (Tr. 55-56). She coped with her symptoms by taking a "nerve pill" and using a nebulizer (Tr. 56). She was unable to cook due to her inability to "remember to turn the water off," and was unable to take a bath unless another individual was at home (Tr. 56). She avoided showering after falling in the bathtub due to dizziness (Tr. 56). She had short term memory deficits (Tr. 57). She was unable to sit for more than 10 minutes due to back and leg pain (Tr. 57). She napped for two to three hours every day (Tr. 58). She was unable to walk more than three blocks (Tr. 58). Breathing problems prevented her from climbing even one flight of stairs (Tr. 59). Hand tremors interfered with her ability to perform manipulative activities (Tr. 59). She did not know how to use a computer (Tr. 60). She denied overusing or misusing prescription drugs (Tr. 60-61).

### B.   Medical Evidence

### 1. Treating Sources[2]

In February, 2001, Plaintiff sought mental health treatment for the overuse of prescription drugs, stress, anxiety, and suicidal ideation (Tr. 428). She indicated that she had an assault and battery charge pending (Tr. 428). She reported long-term anxiety due to situational stressors (Tr. 429). She acknowledged multi-substance drug abuse (Tr. 430). Plaintiff reported that she was supported by her boyfriend (Tr. 430). She was assigned a

---

[2]Evidence pertaining to Plaintiff's condition before the alleged onset date of December 13, 2005 is included for background purposes only.

GAF of 50[3] (Tr. 432).   In May, 2001, she reported an improved mood, family interaction, and sleep with the use of Klonopin and Zyprexa (Tr. 438).   July, 2001 treating notes show that Plaintiff's outlook and mood continued to improve (Tr. 442).   In November, 2001, she reported that after running out of psychotropic medication for over two weeks, she got into a "cat fight" (Tr. 450).   In April, 2002, Plaintiff reported being angry with her primary care physician after he discontinued a prescription for opiates (Tr. 472).   She stopped mental health treatment in February, 2002 (Tr. 487).

Plaintiff voluntarily resumed mental health treatment in April, 2004 (Tr. 481).   She admitted to obtaining opiates from a girlfriend (Tr. 481).   She reported using pills to cope with anxiety (Tr. 483).   Psychiatrist Christine Olson, M.D. increased Plaintiff's dose of Zyprexa (Tr. 484).   The following month, Plaintiff sought emergency treatment for back pain (Tr. 705).   She was prescribed Toradol (Tr. 706).

In October, 2004, John B. Rasor, D.O. noted Plaintiff's report of stress due to a 56-hour workweek as a "heavy production worker," her son's incarceration, and low back pain (Tr. 613).   Dr. Rasor observed a normal gait, the ability to change positions without difficulty, and clear lungs (Tr. 613).   A November, 2004 MRI of the cervical spine showed a herniation at C4-5 (Tr. 561).   An MRI of the lumbar spine showed mild degenerative

---

[3]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.   *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* (*"DSM-IV-TR"*) 34, (4th ed.2000). *DSM-IV-TR* at 34.

changes at L3-4 but no other abnormalities (Tr. 562). Dr. Rasor's notes from the following month state that Plaintiff had recently been charged with domestic assault (Tr. 616). Plaintiff noted that her work required her to lift up to 100 pounds "with a coworker's help" (Tr. 616). Dr. Rasor prescribed extra strength Vicodin "as needed" (Tr. 620). The following month, Dr. Rasor again prescribed extra strength Vicodin, Klonopin, and an inhaler treatment for respiratory symptoms (Tr. 580-581). Two weeks later, Michael E. Holda, M.D., noting full ranges of neck and back motion, issued prescriptions for Vicodin and Xanax (Tr. 528).

Beginning in January, 2005 to July, 2005, Dr. Holda issued a number of week-long work releases due to lumbar disc disease (Tr. 573-578). In March, 2005, a biopsy revealed a benign breast mass (Tr. 547, 569, 642-643). The same month, Dr. Rasor opined that Plaintiff required "time off before and after" surgery (Tr. 625). April, 2005 physical therapy intake notes state that Plaintiff reported low back pain upon sitting (Tr. 560). A discharge summary from the following month states that she attended only one session (Tr. 553). An August, 2005 chest x-ray showed unremarkable results (Tr. 541). In October, 2005, Dr. Holda observed a normal gait, mood, and affect (Tr. 517). A December, 2005 chest x-ray was negative for abnormalities (Tr. 732). In February, 2006, Plaintiff reported that she was currently "laid off" (Tr. 502). In August, 2006, Plaintiff reported increased low back pain (Tr. 511).

A November, 2006 MRI of the lumbar spine showed mild spondylosis and "mild to moderate" stenosis at L5-S1 (Tr. 534, 604). An MRI of cervical spine showed mild

effacement of the nerve root sac (Tr. 603).   The following month, Dr. Rasor noted that Plaintiff had become dependent on opiates (Tr. 636).   He remarked that Plaintiff was currently working as a welder and enjoyed her job (Tr. 636).   He advised Plaintiff to resume the use of a wrist splint (Tr. 638).   The physical examination was unremarkable (Tr. 637).

In January, 2007, Dr. Rasor noted that Plaintiff experienced stress due to recent family problems but observed that her "mentation" appeared unimpaired and that she had a normal range of motion (Tr. 639-640).   The following month, an x-ray of the chest was unremarkable (Tr. 668, 674).   An x-ray of the lumbar spine showed "minimal spondylosis" (Tr. 675).   X-rays of the cervical spine and left elbow were unremarkable (Tr. 676-677). An MRI of the lumbar spine showed "a mild to moderate left and a mild right foraminal stenosis" and "mild multi-level spondylosis" (Tr. 684-685).   A CT of the brain was also unremarkable (Tr. 688).   The same month, Dr. Rasor observed that Plaintiff was "responsive" and was in no apparent distress (Tr. 866).   Treating notes from the following month also state that Plaintiff appeared comfortable (Tr. 864).   Dr. Rasor's April, 2007 notes state that Plaintiff's medications were "helpful and well tolerated" (Tr. 858).   In December, 2007, Plaintiff reported a "good" energy level (Tr. 830).

February, 2008 imaging studies of the thoracic spine were unremarkable (Tr. 878). Dr. Rasor's treating records state that Plaintiff experienced back pain after her sister pushed her, but her health was "otherwise about the same" (Tr. 899).   May, 2008 MRIs of the lumbar and cervical spine showed no nerve root impingement and were otherwise unchanged

-7-

from a previous study (Tr. 876-877). The same month, Plaintiff reported stress due to legal problems (Tr. 892). She reported smoking two to three packs of cigarettes each day (Tr. 892). In July, 2008, Plaintiff reported level "seven" to "ten" back pain on a scale of one to ten (Tr. 928). August, 2008 notes state that nerve block injections were recommended (Tr. 921). Plaintiff underwent nerve block injections later the same month (Tr. 912). August, 2008 pain treatment notes state that she was "feeling fine" (Tr. 924). In September, 2008, Dr. Rasor opined that Plaintiff was incapable of all manipulative activity: standing or sitting for more than one hour each day, or any lifting on a frequent basis (Tr. 949). His treating notes from the same month state that Plaintiff appeared "well overall" (Tr. 971). He issued a similar opinion in January, 2009 (Tr. 951). His notes from the following month state that Plaintiff appeared well and exhibited an appropriate mood (Tr. 960). In March, 2009, Plaintiff reported good results from nerve blocks (Tr. 1154). March, 2009 pain management discharge notes state that Plaintiff's level of discomfort had decreased since starting treatment (Tr. 909). In November, 2009, Dr. Rasor re-prescribed a Klonopin prescription for use "as needed" (Tr. 1128). The following month, neurologist Rukhsana Begum, M.D. conducted an examination, noting Plaintiff's claims of memory problems since a barbell fell on her head six months earlier (Tr. 1199). Dr. Begum recommended a neuropsychological evaluation (Tr. 1201).

In February, 2010, Shelly J. Neitzel, M.D. conducted a pulmonary examination, noting wheezing but a "pulse ox" of 97 percent (Tr. 1197-1198). In April, 2010, Dr. Rasor restated

his earlier opinion that Plaintiff was incapable of even sedentary work, adding that Plaintiff's psychological conditions and narcotic use limited her ability to drive or operate heavy machinery (Tr. 1124). In March, 2010, Dr. Begum opined that Plaintiff's memory problems were partially attributable to psychological issues (Tr. 1203). The following month, he recommended that Plaintiff and her boyfriend attend "drug rehab" (Tr. 1205). Plaintiff's July, 2010 psychological intake notes state that she exhibited confusion possibly attributable to the substance abuse or a psychological condition (Tr. 1169). She admitted to marijuana use every day for the past 25 years (Tr. 1174). She acknowledged that she had been discharged by a physician in the past for abusing narcotic prescriptions (Tr. 1178). She was assigned a GAF of 40[4] (Tr. 1140). In August, 2010, R. Anthony Cueto, M.D. administered nerve blocks to the lumbar spine (Tr. 1148). In November, 2010, Dr. Cueto administered nerve blocks for the treatment of headaches (Tr. 1140). Dr. Rasor's June, 2011 office notes state as follows: "[W]e got a call from a gentleman who would not leave his name who tells me that his son[] has purchased Vicodin and Klonopin from [Plaintiff] at least two times in the past, one recently" (Tr. 1219).

In July, 2011 psychological therapist Dan Dailey (noting that he counseled Plaintiff between July, 2010 and January, 2011) completed a questionnaire, finding that Plaintiff experienced anhedonia and/or delusions and paranoid thinking (Tr. 1188, 1191). He found

---

[4]A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM-IV-TR* at 34.

that Plaintiff experienced intermittent symptoms of bipolar disorder (Tr. 1188).  He found that she did not experience panic attacks but had been diagnosed with obsessive compulsive disorder ("OCD") (Tr. 1188).  He found moderate restriction in activities of daily living and the presence of concentrational deficiencies (Tr. 1189).  He found severe limitation in the ability to remember procedures, understand and remember detailed instructions, complete a normal workweek with psychological interruption, or travel to unfamiliar places (Tr. 1190). He opined that Plaintiff was incapable of even low stress work (Tr. 1191).

### 2.  Non-Treating Sources

#### a.  Mental Conditions

In March, 2007, John E. Jeter, M.A.  performed a consultative examination on behalf of the SSA, noting Plaintiff's allegations of breast cancer, bipolar disorder, anxiety, intermittent explosive disorder, dysthymia, drug abuse, emphysema, headaches, and back, neck, and elbow pain (Tr. 778).  Plaintiff reported that she drove to the assessment (Tr. 778). She exhibited good grooming and normal posture and gait (Tr. 778).  She reported that she was able to shop, drive, handle money, cook, provide child care, socialize, read, make appointments, and launder clothes, adding that she required assistance from her boyfriend and niece due to "pain and mobility issues" (Tr. 779).   Jeter noted that Plaintiff exhibited goal directed thoughts, good concentrational abilities, and was able to follow directions (Tr. 780).  She denied current depression (Tr. 781).   Jeter assigned Plaintiff a GAF of 60[5] (Tr.

---

[5]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or

781).

Also in March, 2007, Rom Kriauciunas, Ph.D. completed a Psychiatric Review Technique, noting a diagnosis of bipolar disorder (Tr. 799), intermittent explosive disorder (Tr. 803), and substance abuse disorder (Tr. 804) with mild limitations in activities of daily living, moderate limitations in social functioning and concentration, persistence, or pace, and "one or two" episodes of decompensation (Tr. 806). Dr. Krauciunas also completed a Mental Residual Functional Capacity Assessment, finding the presence of moderate limitations in understanding, remembering, and carrying out detailed instructions; interacting appropriately with the general public; maintaining socially appropriate behavior; and responding appropriately to workplace changes (Tr. 810-811). Dr. Kriauciunas found that Plaintiff was able to perform "simple, unskilled work on a sustained basis" (Tr. 812).

### b. Physical Conditions

In March, 2007, Mary C. Wood, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's claims of back and neck pain; limitations in crouching and gripping; and shortness of breath (Tr. 784). The physical examination was unremarkable (Tr. 786-787). Dr. Wood noted that Plaintiff's lungs were clear and that she did not need a walking aid (Tr. 788).

The same month, Cheryl Newby completed a Physical Residual Functional Capacity Assessment, finding that Plaintiff could lift 20 pounds occasionally and 10 pounds

---

moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

frequently; stand or walk for six hours in an eight-hour workday and sit for two; and push and pull without limitation (Tr. 815). Newby found that Plaintiff was limited to occasional overhead reaching and an environment free of concentrated exposure to humidity, vibration, and respiratory pollutants (Tr. 817-818). Newby concluded that Plaintiff's claims of physical limitation were "partially credible" (Tr. 819).

### C. Vocational Expert

VE James R. Engelkes characterized Plaintiff's former jobs as a part sorter, air-conditioning valve assembler, and assembler (general) as exertionally light and unskilled; latrine assembler and grocery truck unloader, heavy/unskilled; and grocery truck unloader (supervisor) heavy/semiskilled[6] (Tr. 62). The ALJ then described the following hypothetical individual, using Plaintiff's age, education, and work background:

> [A] range of light, unskilled work. That range would further be restricted by requirements of clean air environment, that there be no use of air or vibrating tools, there would be no requirements for having fine, manual dexterity, no walking more than 100 feet, and no working around moving machinery or unprotected heights. With all of those limitations, would there be light, unskilled jobs? (Tr. 63).

The VE responded that given such limitations, the hypothetical individual could work as a

---

[6]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

collator operator (5,000 positions in the State of Michigan); sorter/folder (3,000); and office clerk (8,000) (Tr. 63). The VE testified further that if Plaintiff's testimony regarding her limitations were fully credited, she would be unable to perform any work due to problems in mental functioning, memory, concentration, and need to nap for up to three hours each day (Tr. 64). He noted that the above jobs would not require public interaction (Tr. 64). He stated that his testimony conformed to the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 64). In response to questioning by Plaintiff's attorney, the VE testified that if the restriction of "moderately severe difficulty in the ability to maintain attention and concentration for extended periods" were added to the hypothetical restrictions, the job testimony would remain unchanged (Tr. 66).

### D. The ALJ's November 9, 2011 Decision

Citing the medical transcript, ALJ Walters found that although Plaintiff experienced the severe impairments of "degenerative changes of the cervical and lumbar spine; left elbow epcondylitis; status post left wrist soft mass excision; obesity; headaches; chronic obstructive pulmonary disease and tobacco addiction; history of closed head injury; bipolar disorder; anxiety related disorder; personality disorder; obsessive compulsive disorder; [and] history of polysubstance abuse," none of the conditions met or medically equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 25, 31).

The ALJ found that Plaintiff experienced moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 31). The ALJ

-13-

determined that Plaintiff retained the residual functional capacity ("RFC") for unskilled, light work with the following additional limitations:

> [S]he can lift and carry 20 pounds occasionally and 10 pounds frequently; she can sit 6 hours in an 8-hour workday; she can stand and/or walk 6 hours in an 8-hour workday, but cannot walk more than 100 feet at one time; she cannot use air or vibrating tools; she cannot work around moving machinery or unprotected heights; she cannot perform tasks requiring fine manual dexterity; she is limited to jobs performed in a clean air environment; she is limited to jobs involving unskilled tasks and no interaction with the public (Tr. 32).

Adopting the VE's job findings, he determined that Plaintiff could perform the work of a collator operator, sorter/folder, and general office clerk (Tr. 36).

The ALJ rejected a portion of Plaintiff's allegations, finding that her credibility was undermined by a "history of substance misuse, illegal acts and suspected sale of controlled medications" (Tr. 34). The ALJ noted that Plaintiff's testimony that she required long daily naps and the elevation of her legs was unsubstantiated by the medical transcript (Tr. 34). He found that her documented psychological conditions did not prevent her from performing unskilled work (Tr. 34). Contrary to Plaintiff's testimony, he cited evidence showing that she was able to drive, shop, use money orders, read, wash clothes, prepare simple meals, take care of her dog, and spend time with family members (Tr. 34). He accorded "limited weight" to Dr. Rasor's disability opinions, noting that the opinions were inconsistent with the physician's treating observations and the objective evidence (Tr. 34).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine

-14-

whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less than a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## <u>FRAMEWORK FOR DISABILITY DETERMINATIONS</u>

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence,

whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  Substantial Evidence Supports the RFC

 Plaintiff argues first that the ALJ erred by failing to adopt or even acknowledge testimony given at the original May 20, 2009 hearing by Medical Expert Andrew Steiner, M.D. *Plaintiff's Brief,* 16-17, *Docket #13* citing (Tr. 83-84).  She contends that the ALJ was required to articulate the weight accorded Dr. Steiner's opinion that she was limited to sedentary work.  *Id.*

Defendant notes that Dr. Steiner's testimony was taken by ALJ Washington at the first hearing, followed by a second *de novo* hearing by ALJ Walters.  *Defendant's Brief* at 14-15, *Docket #18.*  Defendant argues that as such, ALJ Walters was not obliged to consider the previous findings by Dr. Steiner.  This argument is not well taken.   To be sure, Defendant

is correct that ALJ Walters was not bound by ALJ Washington's RFC, Dr. Steiner's testimony, or any of the other previous findings.   However, the Appeals Council remand order required the ALJ to evaluate Dr. Rasor's disability opinions, address Plaintiff's moderate limitations in social functioning, provide a rationale for the RFC, and obtain additional vocational testimony (Tr. 109-110) but does not indicate that Dr. Steiner's testimony was to be disregarded.

Pursuant to 20 C.F.R. § 404.1527(e)(2)(ii-iii), the ALJ is required to articulate weight given to the opinions of medical experts providing hearing testimony.   *See also,* SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996).   ALJ Walter's decision does not include mention of Dr. Steiner's testimony, much less the weight according to the sedentary work finding. His failure to do so constitutes error.   The question before the Court is whether the ALJ's failure to discuss Dr. Steiner's opinion requires remand.   I conclude that it does not.   First, Dr. Steiner's testimony that Plaintiff's back condition did not meet or medically equal a listed impairment (Tr. 83) is consistent with the ALJ's finding (Tr. 31).   While Dr. Steiner also found that Plaintiff was limited to sedentary work, determination of her exertional level (in contrast to the issue of whether she meets or equals a listed impairment) is reserved for the Commissioner. § 404.1527(d)(2).   Plaintiff's argument is based solely on the ALJ's failure to discuss Dr. Steiner's "sedentary" finding.   Because determination of her exertional level was outside the purview of the medical expert to begin with, she cannot show how remanding the case for discussion of Dr. Steiner's "sedentary" finding would change the

-17-

outcome. *See Mackey v. Astrue,* 2011 WL 3417096, *7 (N.D.Tex. August 4, 2011)(ALJ's failure to accord weight to ME's opinion harmless error, noting determination of claimant's RFC was issue reserved for the ALJ). While the failure to acknowledge a *treating* opinion of limitation or disability constitutes reversible error, *see Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004)*,* I am unaware of any case law holding that the failure to discuss medical expert testimony taken at an earlier hearing, by itself, requires remand. Moreover, as discussed further below, ALJ Walter's opinion otherwise contains an exhaustive discussion of the treating, consultative, and non-examining opinions, including the rationale for the weight accorded various sources.

To the extent that ALJ Walter's findings differ from the June 10, 2009 findings by ALJ Washington, I note that evidence created after the earlier decision stands sharply at odds with Plaintiff's allegations of disability. February, 2010 pulmonary testing showed a "pulse ox" of 97 percent (Tr. 1197-1198). In April, 2010 Dr. Begum, noting the absence of a neurological explanation for Plaintiff's alleged memory problems (Tr. 1203), opined that Plaintiff should attend "drug rehab" (Tr. 1205). In July, 2010 Plaintiff acknowledged daily marijuana use for the past 25 years and admitted that she had been discharged by a physician in the past for the abuse of opiates (Tr. 1174, 1178).[7]

---

[7] Dr. Rasor's June 27, 2011 treating records state that Plaintiff was reported to have been selling her prescribed narcotic medication to others on multiple occasions (Tr. 1219). Dr. Rasor's treating records end abruptly on the same day. Earlier records show that she was simultaneously obtaining Vicodin from two different treating sources (Tr. 528, 580-581).

**B.  The Treating Physician Analysis and Related Arguments**

In Plaintiff's second and third arguments, she disputes the ALJ's statement that *"no physician imposed a work preclusive limitation on the claimant's functioning,"* noting that Dr. Rasor stated on multiple occasions that she was unable to perform any work.  *Plaintiff's Brief* at 17-18 (citing Tr. 33).  She acknowledges that the ALJ subsequently addressed Dr. Rasor's disability opinions, but contends that the ALJ erred in finding that the opinions were not well supported by the objective evidence.  *Id.* at 18-24.

On a related note, she argues that the ALJ erred by rejecting Dr. Rasor's opinion regarding the mental limitations, noting that the opinion was supported by the findings of her therapist Dan Daily.  *Id.*  She contends that although the ALJ purported to adopt the opinions of Drs. Kriauciunas and Tsai (consultative and non-examining sources respectively) the hypothetical question posed to the VE did not reflect their findings as to the degree of psychological limitation.  *Id.* at 23-24.  In her final argument, Plaintiff contends that the ALJ erred by failing to address Dr. Rasor's finding that her work abilities were compromised by medication side effects.  *Plaintiff's Brief* at 24-25.

**1.  "Work Preclusive Limitations"**

Plaintiff takes issue with the ALJ's statement, found at the beginning of the credibility determination, that "no physician imposed a work preclusive limitation on the claimant's functioning" (Tr. 33).  She is correct that this finding misstates the record, which contains

-19-

multiple "disability" opinions by Dr. Rasor (Tr. 949, 951, 1124).    However, as acknowledged by Plaintiff, this misstatement is rendered harmless by the full blown discussion of Dr. Rasor's opinions found on the next page (Tr. 34).   Despite the ALJ's misstatement, the treating physician analysis found on page 34 is "'supported by the evidence in the case record" and is "'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"   *Gayheart v. Commisioner of Social Security,* 710 F. 3d 365, 376 (6th Cir. 2013)(citing SSR 96-2p, 1996 WL 374188, *5 (1996)).   Accordingly, the ALJ's misstatement does not constitute grounds for remand.

## 2.   The ALJ's Rejection of Dr. Rasor's Opinion

 The Court next considers Plaintiff's argument that the ALJ's analysis of Dr. Rasor's opinion (Tr. 34) is not supported by the transcript.

Plaintiff is correct that an opinion of limitation or disability by a treating source is entitled to deference. "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(citing *Wilson, supra,* 378 F.3d at 544.   Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the

-20-

record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.

*Wilson,* at 544 (citing 20 C.F.R. 404.1527(c)(2-6)).  The failure to provide "good reasons" for rejecting a treating physician's opinion constitutes reversible error.  *Gayheart, supra,* 710 F. 3d at 376 (citing *Wilson,* at 544-446).

Plaintiff takes issue with the ALJ's finding that Dr. Rasor's opinions were "'devoid'" of "'specific abnormalities.'"  *Plaintiff's Brief* at 18-19 (citing Tr. 34).  In support of her contention that Dr. Rason's opinion was supported by the imaging studies, she cites 2004 and 2006 MRI studies showing a cervical disc herniation and degenerative disc changes of the lumbar spine.  *Id.* at 19.   She argues that the ALJ parsed the MRI results to justify his rejection of Dr. Rasor's findings.  *Id.*

 The ALJ's summation of the imaging studies does not amount to a distortion of the record.  The ALJ correctly noted that although the MRIs revealed degenerative changes, they did not show nerve root impingement, profound stenosis, severe degenerative changes, or other pathologies which would support allegations of disabling pain (Tr. 33).  The ALJ noted accordingly that Dr. Rasor's opinion that Plaintiff was unable to bend, stoop, or manipulate objects was not well supported (Tr. 34).

Plaintiff also takes issue with the ALJ's finding that her headaches were intermittent, citing Dr. Begum's reference to "daily headaches" (Tr. 1201).  However, Dr. Begum's reference to "daily headaches," made during an initial examination, appear to restate Plaintiff's claims rather than his own diagnosis (Tr. 1201).  The ALJ's finding that Plaintiff's

-21-

respiratory conditions did not render her disabled is supported by numerous treating and examining records showing no abnormalities (Tr. 613, 674, 732, 788, 866).  To the extent that the treating records show some degree of breathing problems, the ALJ addressed those limitations by limiting Plaintiff to jobs performed in a "clean air environment" (Tr. 32).

Plaintiff's contention that the ALJ erred by failing to credit Dr. Rasor's findings of psychological limitation is also without merit.  *Plaintiff's Brief* at 22-23.  She also makes a short, independent argument that the ALJ did not address Dr. Rasor's finding that she experienced significant medication side effects.  *Plaintiff's Brief* at 24-25.   However, the ALJ cited Dr. Rasor's frequent observations that Plaintiff was "alert, appropriate and without impaired mentation" (Tr. 34).  My own review of the transcript reveals that Dr. Rasor consistently found Plaintiff mentally unimpaired with a normal affect (Tr. 637, 639-640, 960, 971).  Other records by Dr. Rasor state that the prescribed medication was "helpful and well tolerated" (Tr. 858).   Likewise, the ALJ did not err in according only minimal weight to therapist Daily's opinion that Plaintiff experienced disabling symptoms (Tr. 34-35).   In support of the rejection, the ALJ noted that Daily's scant treating records  were confined to a six-month period (Tr. 35).

On a related note, Plaintiff argues that although the ALJ stated that he adopted the non-examining findings of Dr. R. Kriauciunas, the hypothetical question to the VE did not include Dr. Kriauciunas' finding that Plaintiff could not maintain attention and concentration for extended periods. *Plaintiff's Brief* at 23-24 (citing 810).  She cites *Edwards v. Barnhart,*

383 F. Supp 2d 920-931 (E.D. Mich. 2005) in support of the argument that the hypothetical limitation to "unskilled work" was insufficient to account for her inability to concentrate for extended periods. *Id.*

Plaintiff is correct that the hypothetical question to the VE did not reference Dr. Kriauciunas' finding of moderate deficiencies in the ability to maintain concentration for extended periods (Tr. 63). She is also correct that *Edwards* holds that a hypothetical limitation of unskilled work, as found in the present hypothetical question, with nothing more, may be insufficient to account for moderate concentrational deficiencies. *See also Ealy v. CSS,* 594 F.3d 504, 516-517 (6th Cir. 2010). Nonetheless, this argument is a loser. In response to the  question containing only the modifier of "unskilled work," the VE testified that the hypothetical individual could perform the work of a collator, sorter/folder, or office clerk (Tr. 63). In response to followup questioning by Plaintiff's attorney, the VE testified that if the restriction of "moderately severe difficulty in the ability to maintain attention and concentration for extended periods" were added to the hypothetical question, the job findings and numbers would remain unchanged (Tr. 66). Thus, remanding the case for the inclusion of moderate long term concentrational difficulties or language to that effect in the hypothetical question would result in an identical finding. *See Wilson, supra,* 378 F.3d at 547 (citing *NLRB v. Wyman-Gordon,* 394 U.S. 759, 766 fn. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)) (plurality opinion)("where remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game").

-23-

In closing, I note that the transcript amply supports the administrative findings. Based upon my own review of the medical records, I conclude that the ALJ's summation of the voluminous transcript is well developed and supported. His determination that Plaintiff is capable of unskilled light work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than 20 pages in length

unless by motion and order such page limit is extended by the court.  The response shall

address specifically, and in the same order raised, each issue contained

within the objections.


                                        s/ R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE
Dated: May 30, 2014


                            CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record
on May 30, 2014, electronically and/or by U.S. mail.

                                        s/Carolyn M. Ciesla
                                        Case Manager to the
                                        Honorable R. Steven Whalen